Your Honors, good morning. Gary Burcham on behalf of Appellant Harry Humphries. There are four reasons why this Court should reverse Mr. Humphries' conviction for storing hazardous waste without a permit. Unless this Court wants me to start with any of the four issues, I'd like to go through them in the order presented. Well, I have one overarching question. I'm not sure what four issues. But there seems to be, in the term of disposal, two meanings of disposal. You can dispose of something like remove something. But one of the issues in this case is the jury instruction where the disposal was read. And under RCRA, disposal means something very different. It has the notion that you're getting rid of something that is hazardous waste. It's something that is subject to control. So you don't just move it off your property. It has a lot with it. And yet, in your brief and in your discussion, you're shifting, it seems to me, as a reading, between the benign concept of disposal, i.e. removal, and the notion that somehow if the jury had understood he was just planning to move it off the property, that's all we're talking about. But that's not what disposal means under RCRA. So I hope in the course of whatever four issues you're talking about, you can be sure that we're talking about disposal in the sense that's relevant to RCRA. Right, Your Honor. And that's the first issue, the one I was going to start with. Mr. Humphrey's defense in this case was essentially twofold. Number one, there was a lot of dispute over the solid waste issue. Was the toluene and was the methanol solid waste? And that was one of the defenses and one of the issues in the case. The storage and disposal issue also came up in the context of the way the company was forced to stop operating. Mr. Humphrey testified and said that when the company was operating, the toluene and the methanol were not waste, but as soon as they were told to get off the property because the property was going to be sold, at that point he understood that they were no longer things he was going to use, and at least for the toluene, that was a waste that needed to be disposed of or removed from the property. And what he said to the jury in the defense that was presented was, it wasn't my fault. I was operating. I was reusing the toluene. I was not storing any sort of hazardous waste on my property. And then out of the blue, out of nowhere, I'm told you have to vacate the property. You have to get rid of this stuff. You have to clean up the entire property and make it available for sale. And so Mr. Humphrey essentially said at that point, look, I wanted to dispose of these materials just as much as they wanted me to dispose of them, but given the way the business was shut down, resource issues, issues regarding financing, issues regarding containerizing and getting these materials ready to move, that he didn't knowingly store it. He didn't store it with the intent required under the indictment in this case. And so I understand that the RCRA has a very specific definition for disposal. That was the first thing that the district court read to the jury in response to their question. But clearly the jury was in tune at some level with Mr. Humphrey's defense as indicated by their question in the first place. If the jury was not considering and contemplating Mr. Humphrey's defense about the way this came about and the fact that he was stuck with these materials unexpectedly without the money and the resources to immediately dispose of them, then the jury would have never asked the question about whether the disposal begins with the actual disposal as set forth in the instruction and in the CFR or if it can begin with a decision, the intent to dispose, which Mr. Humphrey testified that he had as soon as he was forced to shut down his operations based upon the sale of the property and the order to clean off the property. The second issue, I think probably the clearest error in this case, concerns the testimony from Ernest Riguli, the attorney who worked for the trust that owned the property. Riguli was not someone versed in chemicals. He was not a chemical engineer. He was a lawyer who worked, again, for the trust that owned the property. He was called by the government, I assume, to talk about the contact that he had with Mr. Humphrey's in August, September, October, November, December, and then January of 2006, I think to show that Humphrey's was there and knew what was happening and was part of the process of removing the materials. The government asked Riguli, or I should say Riguli twice was allowed to testify by the district court as to whether the materials at issue were waste. Waste in what sense? Waste in terms of solid waste, hazardous waste, waste in terms of the issue in the case. One of the elements of this crime was that it was solid waste that was hazardous. And twice, Riguli, who had absolutely no background in chemical engineering or anything related to knowing if these materials were waste or not, was twice allowed by the district court to say in front of the jury that these materials were waste. Wasn't that a lay opinion, though, under 701? Well, 701 certainly allows for lay opinions, but only when it's something that would be known by the common person. I don't know any common person who could go look in a barrel and look inside of it and say, well, that's waste or that's not waste. Go ahead. And that's essentially what Riguli did. He had no, again, no foundation to give any scientific or expert testimony, and he twice was allowed by the district court to specifically say, I was there, I saw this stuff, and it was waste. And there was no basis under 701 or 702 for him to even begin to give such an opinion. Well, I want to just ask this question in line. Didn't Mr. Humphreys himself say that between October and December 2005, the used methanol and toluene were properly characterized as waste? Once the items were, once the shutdown occurred, as we talked about with that first issue, once the shutdown occurred and they were no longer processing these chemicals and mixing the chemicals and blending them, he basically said, yeah, at that point they were waste because they were no longer. Okay, you're saying Riguli regularly or whatever was using it in a technical sense, not the same sense that Mr. Humphreys was? Well, it's similar in that they were both using the term waste, but it was different in that Riguli was trying to say that the entire time GSGI was operating, the toluene was waste and the methanol was waste. That's the point that Riguli was trying to get across. And if that wasn't bad enough, in his final answer. Let me ask this question. If the defendant testified about waste and Riguli also testified about waste, even if there was a problem with that, isn't that harmless error? I mean, isn't that something that really doesn't make a difference in the purpose of this appeal? I don't think so, Your Honor, because in this case, the question wasn't necessarily whether it was waste once they were shut down at the end of 2005 and prior to it being hauled off in January 2006. The issue in this case really was the stuff that they were accumulating over time from the 327AB Duracoat reaction and the methanol that came from the other reaction for Henkel and Anchor Chemical. The issue in the case really were those wastes. And the issue wasn't necessarily once they were shut down, did they become waste because they were no longer usable in the business. The issue was were those wastes all along, essentially. And Riguli did not say the former. He said the latter, which was these were waste. And after being allowed to twice give that opinion based upon simply, I don't know, looking at the stuff, I'm not really sure what the opinion was based on. He was out there trying to get Mr. Humphreys to clean up the property. But then he said, and this is the worst part, he said it's waste, I know it's waste, and I'm right because the materials have been tested and analyzed and proven to be waste. Well, that was textbook vouching for his own opinion. There were no tests to establish that it was waste. There were no analyses to establish that it was waste. Why are you saying it's vouching? Well, he's referring to evidence not in the record, not introduced at trial. Well, that's hearsay. Well, hearsay, but also vouching for his own opinion that it was waste. Well, vouching, I mean, vouching at least in whether it's a criminal case, you know, prosecutors vouching for the validity of other people's testimony. Okay, well, hearsay, but I guess self-vouching, vouching for his own opinion by not only referring to Is that a legal doctrine you're invoking or you're just simply saying you relied on hearsay evidence? Well, I think it's a legal doctrine. I think vouching can come from the form of the prosecutor, you know, personally guaranteeing something during closing argument. I think vouching can also come from a witness referring to evidence outside the record. And in this case, evidence doesn't even exist. It wasn't like this was something that happened. What's the case, this vouching case? I understand if an expert gets on and, you know, an actual expert, not a lay expert, gets on and testifies based on other tests, that may be permissible or may not. It's hearsay, though. So if it's a lay witness who's saying, well, it's different, it's vouching, is there a case that you have? Well, I just cited the Nekoshea case, which is one of the old Ninth Circuit cases that deals with that. Perhaps the better label for it is using inadmissible hearsay to debunk just his own statement. No matter what we call it, it was bad, it was improper, and it added a second layer of authority to his first improper opinion that this was waste in the first place. Was there a specific objection during the trial that Wrigley's testimony was vouching or some variation of that term? I knew that question was coming. There was a series of questions regarding whether he thought it was waste. There was an objection to the first question. And then there was that second question where that answer came up with the hearsay reference. There was not a specific objection to that question. And then there was a question after that, and that was objected to and overruled. So there was a series of quick questions and answers. He sort of snuck that improper part in there. But shouldn't there have been an objection? Well, there should have been an objection. But one could say by looking at the record that the objection before and the objection afterwards, it was all the same topic, it was all the same line of statements by the witness. And it was objecting to the witness saying that the stuff was waste because that was not something this witness was qualified to talk about. Do you want to save some time? Yes, please.  Thank you. Don't waste time. Good morning. May it please the Court. Dennis Mitchell on behalf of the United States. I'd first like to comment generally that it's clear from the evidence by the time that mid-October, late October came about that GSGI had ceased operating, and I think his defendant even conceded. He had waste on the property. And it seemed as though, you know, the defendant is bewildered. How can I be held criminally liable? I'm trying to get rid of these items. It was too late at that point. This is a very tough statute because it deals with public welfare. Those who engage in business and deal with hazardous waste have to handle it properly. And if your business happens to suddenly go under and you don't have a permit to be storing those materials and you know that you're storing hazardous waste, you're committing a felony offense. And that's what happened here basically from mid-October and subsequently. Even before that period, I submit, that there was enough evidence to show the defendant was knowingly storing hazardous waste. I also want to focus just quickly on the interpretation or at least the argument made by the defendant. Just so I understand, how did Mr. Humphreys come to or knew or should have known that he had hazardous waste? He testified. He testified, for instance, with respect to toluene. He testified extensively as to what the manufacturing process was, how the toluene was used. He knew that there was used toluene on the site and that it was reused in the process. He also knew that it was – I'm sorry. No, how did he know he was in violation of RCRA at that point for storing it? You said there's no dispute that from mid-October 2005, he knew he had waste, but by then it was too late. But let's suppose as of October 2005, what was it that triggered his knowledge at that point? Well, the knowledge is just knowledge of the facts that constitute the offense, but it's not knowledge that what you are doing is illegal. That's one of the things that makes this a tough statute. Whether he knew he was in violation of law is not clear. That's not my question. You said he knew as of – you were characterizing the case. You said Mr. Humphreys, by October 2005, knew he had hazardous waste on his property and he was trying to get rid of it, right? Yes. By then it was too late. The antecedent was that he had been storing and using hazardous waste for many years prior. Okay, but I'm trying to understand as of October 2005, he says, well, you know, I was trying to get rid of it, dispose of it, the two-edged word. What should he – should or could he have done at that point insofar as the disposal aspect? Did he do anything wrong in that regard? What he did wrong was he was storing it without a permit at that point, from the get-go. So at that point, even if he was aware of it and took steps to get rid of it, he'd already committed the felony of storing it. That's correct. And he'd committed it earlier because by accumulating it, and it was being accumulated speculatively, that constituted waste. And he was aware that the used methanol and the used toluene, well, the methanol byproduct and what we refer to as the toluene byproduct or used toluene, he's aware that that's being accumulated on the site. That constitutes waste. So he had already committed the violation. He never had a permit in the first place to be doing this. I just want to comment briefly about the argument that is made by the defendant with respect to the court's instruction to the jury note. The interpretation that the defendant is arguing for with respect to the act of disposal begins with the intent to dispose. It really would render part of the definition of storage of hazardous waste superfluous because storage of hazardous waste includes the temporary containment of hazardous waste. And yet, if one were to follow, if the court were to follow the defendant's argument or interpretation, you could have the example in which an individual is storing hazardous waste for a number of years and when confronted about that by the agent simply says, well, I've been meaning to get rid of that. It would render the statutory definition or at least a substantial portion of that definition superfluous. It would make no sense. And with regard to the effect of the court's interpretation,   and to examine whether the statute would clearly go against what the EPA is trying to do in enforcing environmental laws. If the ---- You've argued that in your brief. I'll submit on that. I'll submit on anything else unless the court has any further questions. That's fine. Thank you. Thank you. Thank you. Thank you. Your Honor, I did want to add one thing. And that is the statement about the Reguley testimony. And I apologize, I have to bring this up sooner. Reguley as far as the government, Reguley was entitled to give a lay opinion under Rule 701. He also testified, however, that the materials had been tested and found to be waste. And he shouldn't have said that. That was wrong. There wasn't a test in this case to determine whether something was waste. There was a test to be done to determine whether it was hazardous, but not whether it was waste. So that was erroneous, and that was an error. And I should have, in hindsight, I was the trial attorney, I should have moved to strike it, and I did not. Having said that, I believe, nevertheless, that the error was harmless and that there was other evidence that show that it substantially supports the conviction of knowingly storing hazardous waste. Without any other questions, I will submit. I appreciate the clarification. I was just looking at that testimony. The Court asked Mr. Mitchell what could he have done by October of 2005, and they said it was too late at that point. Which shows that this isn't just about, you know, did this become waste once they shut down the operations? This is also about, was this waste all along? And that's why the testimony from Regoli was particularly damaging for Mr. Humphreys, because it made it seem like all this time, the entire time GSGI was operating, he was storing hazardous waste, and it wasn't just about what happened when the company was forced to shut down. Well, he was. He was. He was storing hazardous waste without a permit. And that brings up the second point, which is his example, like the EPA comes up and says, you got this hazardous waste, and the guy says, well, I decided to dispose of it five years ago, and so you escape the liability that way. Well, this is an issue that should depend on the facts of a particular case. It's so unfair for Mr. Humphreys, who's never been convicted of anything. He's lived a very honorable and good life. It's so unfair for Mr. Humphreys to be forced to shut down his operations, no fault of his own, simply because. Well, but wait a minute. He supervised the prior company. He knew there had been that complaint. I know that's one of your objections to the evidence, but his knowledge that, and if somebody's, I don't doubt his industry or his career history or anything about that, but the fact is is when you're dealing in hazardous materials, you are charged under RCRA with knowing and therefore following the regulations as to how you store and dispose of it. So in that sense, but to plead it's unfair because they decide to sell the plant. The problem is is he was storing it even before then. Well, that was the issue. Was it waste before then? You need a permit to. Well, if it's not waste, you don't need a permit. And his defense all along was this was never waste. It wasn't waste until they forced me to turn the power off and stop blending, stop mixing. And so if this wasn't waste all along, then at that point, it's not relevant to the case. But going back briefly, the 1992 violation in Amcal, 13 years earlier, a violation that didn't even have to do with storing hazardous waste without a permit. I mean, it was a different company. It was a different owner. It was a different set of facts. There were different violations. Mr. Humphrey should not have a felony conviction for complying with the law up until the point when the company was forced to shut down, and then from that point forward, attempting, doing his very best, and he testified about this, doing his very best to get that stuff off the property. He wasn't able to do it immediately because of a lack of funds, because of the complex process of containerizing and removing the things. But he should not have a felony conviction for his actions post-shutdown. It wasn't his fault. He did the best he could following that point, and it's just not fair for Mr. Humphrey to currently have a felony conviction for his actions from the 90s all the way up until 2005. Okay. Appreciate that. If you have any questions, thank you, and I'll submit. Thank you. Thank you.
judges: Daniel, Pregerson, Fisher